IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| BETTY ADAMSON, <br><br> Plaintiff, <br> v. <br><br> J.C. PENNEY CO., INC., <br><br> Defendant. | **MEMORANDUM DECISION & ORDER** <br><br> Case No. 1:12-cv-154 DN <br><br> District Judge David Nuffer |

This is an employment discrimination dispute. Plaintiff Betty Adamson worked for J.C. Penney Corporation, Inc. ("JCPenney") from 1970 until her dismissal on January 25, 2010. Adamson has sued, claiming violation of the Age Discrimination in Employment Act (ADEA). All claims in the suit relate to Adamson's employment with JCPenney.

JCPenney filed a motion for summary judgment. ([Docket no. 15](#) onJanuary 30, 2014.) For the reasons discussed below, JCPenney's motion for summary judgment is granted.

**MOTION FOR SUMMARY JUDGMENT**

**Undisputed Facts**

The following factual statements from JCPenney's Motion for Summary Judgment and Plaintiff's Response thereto are not disputed.

1. Plaintiff became the Fine Jewelry Department Supervisor at JCPenney's store in West Valley City in May 2005 and was fired on January 25, 2010.

2. In November 2008 Plaintiff complained to JCPenney's Human Resources department that her Store Manager, John Kirschman, refused to do anything about a salesperson defrauding the company by giving customers unauthorized discounts.

3. Contrary to the allegations of her Complaint, Plaintiff testified that Mr. Kirschman ignored Kristin Hulse/Holt's violating company sales policy because she sold a lot of merchandise and made a lot of money for the store-not because she was young. Plaintiff explained, "I must not have proofread it [the Complaint] properly when I gave it back [to my attorney], because this is not true here."

4. After she filed the J-Line complaint, Mr. Kirschman told Plaintiff he was angry with her because Ms. Hulse refused to work in the Fine Jewelry Department anymore. Ms. Adamson (who was the supervisor of the fine jewelry department) got after Ms. Hulse (fine jewelry associate) by telling Ms. Hulse that while she was on the clock, that she needed to be in her position working, not shopping on company time, and Ms. Hulse did not want to work with Ms. Adamson anymore. (Depo. I, 66:9-68:20).

5. Plaintiff admits that between November 2008 and January 2010 she suffered no demotion or decrease in responsibilities, but she believes that her November 2008 complaint had something to do with her being fired 14 months later. After she made her J-Line complaint, JCPenney did alter the conditions of her employment. (See Depo. I, 90:25-91:16; 92:14-93:8; 94:14-22). Sometime after Ms. Adamson filed her J-Line complaint in November 2008, Joe Morea ("Mr. Morea") (District Manager) "came to [Ms. Adamson] and said he was really sorry and didn't realize it had been so hard and that those kind of things were going on." (Depo. I, 80:20-22). Shortly after Ms. Adamson made the J-Line complaint, Dwight Allen (Assistant Store Director), during a store meeting, accused all of the employees of being responsible for Mr. Kirschman's decision to retire (See Depo. I, 81:1-8). Ms. Adamson also testified that one of the consequences of her J-Line complaint was that JCPenney demoted Mr. Kirschman and transferred him to another store, and that because of her actions, her immediate supervisor, Ms.

Williams, who was "very, very, very, good friends with [Mr.] Kirschman," developed a dislike for Ms. Adamson: "she was very angry at me for making that complaint…towards John Kirschman." (Depo. I, 141:21-142:11).

6. Plaintiff believes that Mr. Kirschman was forced to retire in August 2009 because of her November 2008 complaint. However, Plaintiff knew the store was performing poorly, admits that she is only speculating about why Mr. Kirschman left, and she believes that her complaint and the store's performance were among multiple reasons why he was retired. Ms. Adamson contends that because of her complaint, JCPenney discovered that Mr. Kirschman was not looking out for company assets by letting [Ms. Hulse] get away with what she was doing." (Depo. I, 111:20-112:3; 121:15-122:15, 124:25-127:19). Ms. Adamson admits that there may have been a multitude of reasons why JCPenney forced Mr. Kirschman to retire; but she contends that her complaint was one of those reasons. (*Id.*)

7. Plaintiff believes she was fired because she was told that Pam Marcheski, whom Plaintiff describes as about 50, and who became manager of the District that included Plaintiff's store in February 2009, did not like older people. Specifically, Plaintiff testified that Linda Wymer (a fellow department manager) approached Ms. Adamson and informed Ms. Adamson that an employee in Ms. Marcheski's former store had contacted Ms. Wymer and had explained that Ms. Maracheski would do anything to get rid of older workers. (Depo. I, 97-100). From the very beginning of Ms. Marcheski's work as a District Manager, Ms. Marcheski treated Ms. Adamson in a very cold manner, whereas Ms. Marcheski did not look at or treat younger employees in that same manner. (Depo. I, 97-100).

8. Plaintiff described Ms. Marcheski as, "Very cold, direct, knowledgeable," said that she would talk down to her, and that she would squinch her face when looking at the people in Plaintiff's department.

9. Kimberly Williams became the Store Manager in October 2009. Plaintiff testified that her relationship with Ms. Williams soured afterwards because Plaintiff believes Ms. Williams was good friends with Mr. Kirschman and was angry with Plaintiff for making the November 2008 Complaint to HR. After Pam Marcheski became District Manager and after Ms. Williams became the Manager of the West Valley City store, Ms. Williams's behavior towards Ms. Adamson changed, and she began treating Ms. Adamson poorly, and yelled at her on multiple occasions. (Depo. I, 136-139). Ms. Adamson claims that Ms. Williams went so far as to tell Ms. Adamson to "watch your back. There will be somebody in every nook and cranny in this store watching you. I'll have everybody watching what you do or what you say." (Depo. I, 139:16-19).

10. Plaintiff alleged that Ms. Williams treated her "in a very cold and uncaring manner," "would often ignore [Plaintiff] when [Plaintiff] needed to speak with her," and once yelled at her and threatened to watch her because, Plaintiff believes, Plaintiff had so much paid vacation time because of her seniority. Ms. Adamson believed that her seniority, which was a function of her age and tenure with the company, and the benefits that came with such seniority, caused Ms. Williams to treat her in the manner alleged.

11. Plaintiff testified that Ms. Williams yelled at her when she learned that Plaintiff intended to retire on her birthday because she did not want Plaintiff to retire because she did not want Ms. Adamson to get her pension or to get an associate discount/gold discount card. (Depo. I, 141:6-17: Depo. II, 97-98).

12. Plaintiff testified that Ms. Williams once called her lazy but never told anyone else they were lazy.

13. Plaintiff believes that Ms. Williams gave her additional responsibility by temporarily putting her in charge of the accessories department in order to upset her because of her age. She testified that she couldn't explain why giving her additional responsibilities was an act of age discrimination, just that she felt it was. Ms. Adamson contends that Ms. Williams was discriminating against her on the basis of age because, for one thing, Ms. Williams believed that she (Ms. Adamson), because of her age, would not be able to handle the additional responsibilities that Ms. Williams was placing on Ms. Adamson. Ms. Adamson believes that Ms. Williams reasonably believed that adding on to Ms. Adamson's responsibilities would upset her, and that by doing so, Ms. Williams was setting up Ms. Adamson to fail. (Depo. I, 132:4-10, 134: 16-23, 135:5-14).

14. When deposed, Plaintiff admitted she never took advantage of the different ways available for her to make an internal complaint of harassment at JCP, and that she was aware she could complain anonymously. Her prior experience with making the J-Line complaint and angering Ms. Williams discouraged Ms. Adamson from making further complaints.

15. Plaintiff does not assert that Mr. Kirshman's refusal to do anything about Ms. Hulse/Holt was age discrimination. At her deposition, Ms. Adamson did testify that when Mr. Kirschman refused to do anything concerning Ms. Hulse/Holt, that Mr. Kirschman was not treating Ms. Hulse/Holt any differently, and was not taking adverse action against Ms. Hulse/Holt, because of Ms. Hulse/Holt's (or Ms. Adamson's) age. (Depo. II, 22:15-22:23).

16. Expanding upon her written discovery responses during her deposition. Plaintiff identified one younger employee whom she claims Ms. Williams treated more favorably:

Training Supervisor Bethany Wright, who had no employees reporting to her. Plaintiff testified that Ms. Williams treated Ms. Wright more favorably by promising her jobs when other people retired, "and just stuff like that." When pressed, Plaintiff admitted that this was not an "act of age bias against her." Ms. Adamson testified that Ms. Williams treated at least two other employees [Bethany Wright and Shannon Greco] more favorably because they were younger. (Depo. II, 107:8-12). Ms. Adamson contends that J.C. Penney did not give her the opportunity to be a pricing supervisor because of her age. (Depo. II, 105:18-107:12. Depo. II is attached hereto as Exhibit 2).

17. Plaintiff believes that Ms. Williams fired her because she erroneously believed doing so would deprive Plaintiff of her pension. One motivation behind Ms. Williams's decision to terminate Ms. Adamson's employment was "because she [Ms. Williams] had a vendetta against [Ms. Adamson] because of what [Ms. Adamson] did to Mr. Kirschman and because [Ms. Marcheski] didn't like older people in the store." (Depo. I, 147:14-16). When Ms. Williams fired Ms. Adamson, she said "forty years of your career gone down the drain. You don't get your pension, you get nothing." (Depo. I, 149:1-4). Thus, Ms. Adamson does assert that Ms. Williams fired her believing that by firing her, Ms. Williams would be able to deprive her of her pension, which she had earned by virtue of her age and tenure. Ms. Adamson also contends that on another occasion (after Ms. Williams had ended Ms. Adamson's employment), Ms. Williams told other employees, including Glenda Dial and Merle Hansen, not only that Ms. Williams had fired Ms. Adamson, but that Ms. Adamson would not be getting her pension. (Depo. I, 147:17-150:19).

18. The sales associates working under Plaintiff were required to meet productivity standards. As their Supervisor, Plaintiff was required to enforce the standards by giving sales

6

associates who missed their productivity goals written warnings and by firing sales associates who failed to meet their goals for four successive months. Her last Performance Review, for the 2/1/2008 through 1/31/2009 time period, said, "Betty has an opportunity to do a more consistent [job] with her monthly productivity and coaching meeting as well as doing the write ups as needed. Currently we have 2 current associates with 4 or more misses in a rolling 12 months without having correctives done on each one. This cannot be the case in 2009.." ([Docket no. 16-3, at JCP000031](#).) Ms. Adamson testified that she, in conjunction with Mr. Kirschman, focused their efforts on helping these two associates all year long. Mr. Kirschman ultimately made the decision to not terminate those associates, as Ms. Adamson did not have any authority to terminate an associate's employment and [Mr. Kirschman] had decided that both of the two associates "with four or more misses' were worth saving." (Depo. I, 39:20-2:5).

19.  Ms. Adamson acknowledges JCPenney's policy regarding violation of JCPenney's sales procedures which states "Violation of the company's sales procedures could lead to immediate termination of employment." (Depo. I, 54:16-20).

20.  Plaintiff acknowledged receiving a memo about 2009 holiday returns stating Fine Jewelry purchases could only be returned within 90 days of the sale, and JCPenney's Refund Tracking System would be turned off from December 25, 2009 through January 4, 2010.

21.  Plaintiff returned an item of jewelry she purchased on August 1, 2009 on January 3, 2010, long after the 90-day period which was actually stated in the memo had elapsed. Ms. Adamson acknowledges that the policy says that the normal policy requires items to be returned within 90 days; however, in reality, and in JCPenney's customary practice, JCPenney permitted returns (regardless when such items were purchased) if the items were purchased as Christmas gifts. (Depo. I, 187:8-12). Ms. Adamson had purchased the item of jewelry in question as a

7

Christmas gift. (Depo. I, 166:18-21). Ms. Williams informed Ms. Adamson that returning Christmas gifts even after the 90 days was acceptable as JCPenney had always allowed such returns. (Depo. I, 187:8-12).

22. Plaintiff claims that she had Stephanie Davidson, who she described as a manager, "approve her return." (Depo. I, 166:14-17). Ms. Davidson, like Plaintiff, was a supervisor paid by the hour, and not a management employee. JCPenney's returns policy did not contain a provision allowing returns outside of the 90-day period as long as they were approved by a supervisor. Instead, it simply said: "A second authorizing associate MUST put their signature on the 'Authorized By' line of the Refund Slip. The second Associate authorizes that they witnessed the Refund and the customer who received the Refund." (Emphasis supplied). JCPenney's return policy does not distinguish between supervisors and managers and all the policy mandates is that a 'a second authorizing associate" must sign the refund slip. (Deposition I, Exhibit 8, Page JCP 331). Ms. Adamson, therefore, contends that, when Ms. Davidson authorized the return in question, she [Ms. Adamson] did not violate JCPenney's sales procedures. (Id.) Ms. Adamson also asserts that when Ms. Williams confronted her about the return, Ms. Williams stated to Ms. Marcheski, "well, you know, it really was legal for her do to that." (Depo. I, 165:23-168:9).

23. If the Refund Tracking System had been on when Plaintiff made the return on January 3, 2010, it would have rejected the transaction unless a manager's override was entered. A manager's override flags the transaction for the sales audit team, and is rarely used for out-of-date returns. One might see a manager's override used to authorize a return made 5 days after the deadline (which is 60 or 90 days, depending on the time of the year), but not a return requested 155 days after the sale like Plaintiff's. Ms. Adamson contends that while the typical

return period is 60 or 90 days, in her long-term experience with the company, mangers had historically and routinely authorized returns on items purchased over 90 days if such items had been purchased as Christmas gifts, and that such practice was an "inside policy" of JCPenney, which had always done business that way. (Depo. I, 187:8-12).

24. In the second week of January 2010, an issue with a large diamond return came to the attention of Store Manager Williams. It looked like Fine Jewelry Associate Kim Mai's commission on the original sale had not been reversed because of the way the transaction was rung up. In the process of researching the sale and return, Ms. Williams learned that Ms. Mai, another sales associate, and the Plaintiff were purchasing and then returning jewelry to boost their productivity numbers and avoid being fired. Ms. Williams interviewed the two sales associates and sat in while her District Manager, Pam Marcheski, interviewed the Plaintiff. Ms. Adamson denies purchasing and then returning any jewelry to boost any employee's productivity numbers, including her own and those of her associates. (Depo. I, 161:24-168:9, 192:5-11, 14:13-15).

25. After being interviewed by Store Manager Williams, Barbara Nielson gave her a handwritten statement, dated 1/22/10. It said: "I purchased a diamond & moissanite ring from Kim [Mai] to help out her productivity. We were well aware that missing any more productivity would result in a dismissal. . . . We had been really stressed out over missing our productivity. We never had to worry about productivity until the recession and were reminded about what would happen if we had missed three months of productivity. The next day, I noticed on the care plan report that the return was not there. I was worried about it not coming off my credit card so I asked Betty [the Plaintiff] to look into it for me. It hadn't gone through so Betty had to have Judy put it through. Kim [Mai] knew about the return and was surprised that it didn't show on

9

her sales report. I was aware that Betty [the Plaintiff] had helped me out another time with my productivity because I was to miss my productivity again." ([Docket no. 18-6, at JCP000380](Docket no. 18-6, at JCP000380).) Ms. Adamson disputes that she helped out Ms. Nielson or purchased anything from her to help out her productivity. Ms. Adamson testified that, if she ever bought products from JCPenney, she always "bought everything from Barbara [Neilson] because she was my right hand person. So [she] never did buy anything from her just for productivity." (Depo. I, 214:13-15). Ms. Adamson further testified that, based on her own experience of Ms. Williams's forcing her [Ms. Adamson] to write a statement, Ms. Williams likely forced Ms. Nielson and Ms. Mai to write statements similar to what she forced Ms. Adamson to write. (Depo. I, 216:21-217:12).

26. During her deposition, Plaintiff confirmed that Ms. Nielson was one of the associates referred to in the portion of Plaintiff's performance review criticizing her for not discharging two associates who had missed their sales productivity goals.

27. After being interviewed by Store Manager Williams, Kim Mai gave her a handwritten statement, dated 1/22/10, stating: "Barbara [Nielson] told me that she's going to buy the rings to make my productivity in September. Also, I bought the ring (1000$) to make her productivity. After a few weeks, I asked her that you would like to buy the ring from me as Betty's mention you do it-she say 'yes, we talked about that'-Barbara returned the ring in November but it did not show the return under my number.' *Also Betty [the Plaintiff] told me that 'Don't worry Barbara's going to take care of you.' I realized that the return was not under my name yet. *Rebecca rang the diamond ring up for Betty to make Barbara's productivity. (I did not remember what's months on that purchase.) I did return the ring for Betty (not sure what month) about 400$." ([Docket no. 18-6, at JCP000379](Docket no. 18-6, at JCP000379).) Ms. Adamson disputes that she had knowledge of this event and disputes that she ever told Ms. Mai that Barbara Nielson was going

to take care of Ms. Mai (Depo. I, 215:14). Ms. Adamson further testified that, based on her own experience of Ms. Williams forcing her (Ms. Adamson) to write a statement the way Ms. Williams wanted it written, Ms. Williams likely forced Ms. Nielson and Ms. Mai to write similar statements. (Depo. I, 216:21-217:12).

28. During her deposition Plaintiff testified that she believed Ms. Mai was the other associate referred to in the portion of the performance review criticizing Plaintiff for not discharging two associates who had missed their sales productivity goals.

29. Plaintiff acknowledged that the handwritten notes Store Manager Williams took of her January 22, 2010 interview of Ms. Nielson were consistent with Ms. Nielson's January 22, 2010 statement, and reviewed Ms. Williams' handwritten notes of her interview of Kim Mai that were similarly consistent with Ms. Mai's January 22, 2010 statement.

30. Also on January 22, 2010 the Plaintiff wrote a handwritten statement. It said: "I Betty Adamson on August 2 or about I bought a ring from Barbara to help her make her productivity. It was around $300.00. This is the only time I did this. I had every intention of keeping the ring. When I discussed the department productivity in Oct., Kim and Barbara were under productivity standards. They were going to help each other so they would not get fired. I said I wanted nothing to do with it. I know I should have told them they could not do it. Very bad choice. Barbara and Kim would have got the idea from me because Barbara knew I had done it for her once. I returned said ring that I bought in August in January or the end of December…said ring even though I knew it was outside of normal return policy. When I returned the ring I told Kim [Mai] it would ask for an override. It did not. I did not discuss this with anyone. I had told [Store Manager] Kim Williams about what I had done in August because I was feeling guilty. I told her I had returned it but I did not know when. Kim said if it had been

on her watch she would have written me up." Ms. Adamson acknowledges that the handwritten statement is consistent with what is stated above; however, Ms. Adamson contends that Ms. Marcheski and Ms. Williams forced her to write and sign said statement with the content set forth above, and that such statement was not accurate. (Depo. I, 192:5-11).

31. Plaintiff claims that her January 22, 2010 statement was fabricated, and Store Manager Kim Williams and/or District Manager Pam Marcheski forced her to write it.

32. Plaintiff testified that she told Store Manager Williams that another associate, Barbara Nielson, had purchased a ring from associate Kim Mai in order to help her meet her productivity goal." Plaintiff agreed that JCPenney's records show Ms. Nielson purchasing a $5,303.16 ring from Ms. Mai in October 2009, and then returning it a month later. Plaintiff testified that both Ms. Mai and Ms. Nielson were under the productivity standards, and that she had discussed standards with both of them in October 2009. Ms. Adamson contends that Ms. Marcheski and Ms. Williams forced her to include such content in her statement. (Depo. I, 192:5-11).

33. Plaintiff testified that because she returned the ring so long after the August 1, 2009 purchase, Ms. Nielson kept, was not docked, and did not have to return the commission that JCPenney had paid her for the sale.

34. Plaintiff conceded that Ms. Nielson's purchasing items from Ms. Mai in order to help boost her productivity violated JCPenney sales policies and procedures, and that if Plaintiff purchased something from Ms. Nielson to boost her productivity, it would have also violated JCPenney sales policies and procedures. Ms. Adamson did testify that she did purchase an item from Ms. Nielson on or about August 1, 2009, as a Christmas gift and not for the purposes of helping Ms. Nielson's productivity. (Depo. I, 228:7-12).

35. Plaintiff admitted it is possible that Ms. Williams concluded, based on the information before her, that Plaintiff intentionally returned the ring on January 3, 2010, the day before the refund return exchange system was turned back on. It is certainly possible that Ms. Williams came to such a conclusion.

36. After the January 22, 2010 interviews, Store Manager Williams suspended the Plaintiff with pay while waiting for JCPenney's Human Resources to approve her decision to fire the Plaintiff. Ms. Williams made the recommendation to fire Ms. Adamson.

37. Ms. Williams currently states that based on her review of the sales and returns, and the interviews of the three associates involved, Ms. Williams no longer trusted Plaintiff. She found Ms. Mai and Ms. Nielson to be credible and, even if the Plaintiff had denied any wrongdoing, would not have trusted her sufficiently to allow her to continue working at JCPenney. From Ms. Williams' perspective, it was impossible to believe that Plaintiff thought she was not violating JCPenney sales procedures and policies when she returned the ring she bought in August six months later. If Plaintiff truly though she was just taking advantage of some loophole in JCPenney policies and procedures (to JCPenney's detriment), Ms. Williams wouldn't trust Plaintiff not to attempt to similarly take advantage of JCPenney again. With regular review of her departments' sales and returns records, and the benefit of many years of experience, if Plaintiff had been doing her job well she would have discovered what Ms. Mai and Ms. Neilson were doing, and put a stop to it. Ms. Adamson contends that, at the time, Ms. Williams stated to Ms. Marcheski, "well, you know, it really was legal for her to do that" (Depo. 166:24-167:2).

38.     Ms. Adamson did not buy the ring in question to boost anyone's productivity. She returned it after Christmas when the gift of the ring for a Christmas present did not work out. (Depo. I. 228:7-12).

39.     On January 25, 2010 Plaintiff countersigned a Reason For Dismissal form stating: "After management review it was determined that Betty failed to follow company policies and procedures by purchasing jewelry merchandise solely for the purpose of inflating another associate's sales and then returned the items outside the company sales procedures. She admitted to this in her statement on 1-22-10. For the reasons stated above Betty's employment is being terminated for violation of company sales procedures." ([Docket no. 16-3, at JCP000173](Docket no. 16-3, at JCP000173).) Ms. Adamson contends that such statements were not accurate and that Ms. Marcheski and Ms. Williams forced her to sign a statement with such content. (Depo. I, 192:5-11; 204:12-25). Being relatively new to the store, not knowing the personnel that well, and not having made any plans to replace Plaintiff, it took Store Manager Williams, who was 49 at the time, four months to decide who to place in the Fine Jewelry Department supervisor position vacated by Plaintiff. The person ultimately put in the job had been a supervisor in the Home Department, and was younger than the Plaintiff.

**STANDARD FOR SUMMARY JUDGMENT**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1] In applying this standard, the Court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."[2] However, "the

---

[1] Fed. R. Civ. P. 56(a).

[2] *Mathews v. Denver Newspaper Agency LLP*, 649 F.3d 1199, 1204 (10th Cir. 2011) ) (quoting *Lewis v. Circuit City Stores, Inc.*, 500 F.3d 1140, 1146 (10th Cir. 2007)).

nonmoving party must present more than a scintilla of evidence in favor of his position."[3]  A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[4]

**DISCUSSION**

JCPenney moved for summary judgment as to each of Plaintiff's three claims for age discrimination: wrongful termination, hostile work environment and retaliation.  In response to JCPenney's Motion, Plaintiff conceded that her retaliation claim failed.[5]  As such, this order applies to Plaintiff's claims for wrongful termination and hostile work environment due to age.

**Summary of Factual Allegations**

Taken in the light most favorable to Plaintiff, the following facts support her remaining claims:

> (1) An employee in Ms. Marcheski's former store had contacted Ms. Wymer and had explained that Ms. Marcheski would do anything to get rid of older workers.
>
> (2) Ms. Marcheski treated Ms. Adamson in a very cold manner, whereas Ms. Marcheski did not look at or treat younger employees in that same manner.
>
> (3) Ms. Adamson believed that her seniority, which was a function of her age and tenure with the company, and the benefits that came with such seniority, caused Ms. Williams to treat her in the manner alleged.
>
> (4) Plaintiff believes that Ms. Williams gave her additional responsibility by temporarily putting her in charge of the accessories department in order to upset her because of her age.
>
> (5) Ms. Adamson testified that Ms. Williams treated at least two other employees [Bethany Wright and Shannon Greco] more favorably because they were younger.

---

[3] *Ford v. Pryor*, 552 F.3d 1174, 1178 (10th Cir. 2008).

[4] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011).

[5] Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment at 46-47, docket no. 22, filed February 27, 2014.

15

(6) When Ms. Williams fired Ms. Adamson, she said "forty years of your career gone down the drain. You don't get your pension, you get nothing." (Depo. I, 149:1-4.) Thus, Ms. Adamson does assert that Ms. Williams fired her believing that by firing her, Ms. Williams would be able to deprive her of her pension, which she had earned by virtue of her age and tenure.

As a matter of law, these facts are insufficient to support either of Plaintiff's remaining claims of age discrimination.

**Hostile Work Environment**

It is well settled that "[t]o prevail on a claim of hostile work environment, a plaintiff must be able to demonstrate that her workplace was permeated with discriminatory comments or conduct so severe they altered the terms and conditions of employment. In addition, when reviewing allegations of harassment, courts are to filter out offhand comments, and isolated incidents (unless extremely serious)."[6] (internal citations and quotations omitted). To be considered discriminatory and actionable, the alleged harassment must be directed at the plaintiff due to her membership in the protected class, rather than for some other reason. *Id.*

The *Ellerth/Faragher* defense is available to employers who exercise reasonable care to prevent and correct harassing behavior.[7] Under the *Ellerth/Faragher* defense when an employer has established and publicized a program for accepting and addressing complaints of harassment, and preventing further harassment, an employee suing for harassment other than quid pro quo harassment by a superior must demonstrate that she used the program, or that doing so would have been pointless. Plaintiff admitted that she did not make an internal complaint about harassment, and that she was aware that she could complain anonymously. She stated, however, that she was discouraged from making a complaint because of her prior experience with making the J-Line complaint.

---

[6] Hajibeklou v. State of Utah, No. 2:10CV00654 DN, 2013 WL 3973239, at *9 (D. Utah Aug. 1, 2013).

[7] Shabestari v. Utah Non-profit Housing, 377 F. App'x 770, 773 (10th Cir. 2010).

16

Here, Plaintiff has provided insufficient facts to support a claim for hostile work environment. The kinds of things that Plaintiff claims to have been harassing belong in the category of "offhand comments, and isolated incidents" that courts "are to filter out" because they do not paint a picture of a workplace "permeated with discriminatory comments or conduct so severe that they altered the terms and conditions of [Plaintiff's] employment."[8]

The Plaintiff testified to two incidents of being yelled at, being talked down to, being treated in a "cold and uncaring manner," being ignored, being given what might be described as a dirty look, and once being called lazy. This may describe an unappealing boss or an unpleasant workplace, but the incidents are just not severe and pervasive enough to constitute harassing behavior that alters the terms and conditions of employment.[9]

Without discriminatory overtones, discourteous treatment is simply not sufficient to impose liability under Title VII.[10] Plaintiff has alleged cold looks, being yelled at, and her subjective belief that her supervisor wanted to rob her of her pension. These all fall in the category of unpleasant treatment, perhaps, but not a hostile work environment under the law, and nothing that Plaintiff has shown to be caused due to age animus. As such, Plaintiff's claim of hostile work environment fails due to insufficient factual support.

**Wrongful Termination**

"Generally, to establish a prima facie case of age discrimination in termination or reassignment, plaintiff must show that: (1) he was a member of the protected age group . . . ; (2) he was doing satisfactory work; (3) he suffered an adverse employment action; and (4) the

---

[8] Hajibeklou, 2013 WL 3973239, at *9 (internal citations and quotations omitted).

[9] *See. e.g.*, DeWalt v. Meredith Corp., 288 F. App'x 484, 495-496 (10th Cir. 2008).

[10] *See* Chavez v. New Mexico, 397 F.3d 826, 833 (10th Cir. 2005). ("Title VII is not a code of workplace conduct . . . a hostile environment claim requires a showing not only of severe and pervasive harassment, but of severe and pervasive harassment based on [age].").

defendant filled his position with a younger person."[11] However, "[f]avoritism, unfair treatment and unwise business decisions do not violate [discrimination law] unless based on a prohibited classification."[12] The ADEA does not require an employer's business decisions to be wise, just nondiscriminatory.[13] Only when circumstances in which a claimed business judgment is so "idiosyncratic or questionable" that a fact finder could reasonably find that it is pretext for illegal discrimination may the business judgment no longer be immune from judicial review. *Id.*

Here, Plaintiff's manager, Kimberly Williams, explained that as soon as she learned of Plaintiff's involvement in the Mai/Nielsen plan to purchase and return fine jewelry from each other in order to increase productivity numbers and prevent their terminations, Williams lost faith in Plaintiff's ability to supervise her department. First, Mai and Nielsen implicated Plaintiff as having been directly involved in the plans and purchases/returns, which was a terminable offense on its own. Second, as the department supervisor, Plaintiff should have watched more closely, been aware, and stopped any such plans that were developing. By Plaintiff's own words, she conceded that she knew of their plans and did not stop them. Immediately upon learning of Plaintiff's role in the purchase/return scheme, Williams suspended Plaintiff with pay, so that human resources could investigate and advise her. Upon completion of the investigation, Williams terminated Plaintiff's employment. Such a decision was clearly related to Plaintiff's actions as a supervisor, not to her age.

Plaintiff produced no evidence that Williams's explanation was pretext. Her suggestion that Mai and Nielsen's statements were fabricated, without more than Plaintiff's own speculation on this point, is not evidence, much less evidence strong enough to establish pretext in light of

---

[11] *Oglesby v. Hy-Vee, Inc.*, 214 F. App'x 829, 832 (10th Cir. 2007).

[12] *Clark v. Cache Valley Elec. Co.,* No. 2:11-CV-00461-DN, 2013 WL 3873219, at *2 (D. Utah July 25, 2013). (alteration in original) (quoting *Taken v. Okla. Corp. Comm'n*, 125 F.3d 1366, 1369 (10th Cir. 1997)).

[13] *Beaird v. Seagate Tech.*, 145 F.3d 1159, 1169 (10th Cir. 1998).

JCPenney's explanation.  Accordingly, JCPenney is entitled to summary judgment on Plaintiff's wrongful termination claim.

**ORDER**

No genuine dispute of material fact exists on any of Plaintiff's remaining claims. Therefore, Defendant's Motion for Summary Judgment is **GRANTED**.  ([Docket No. 15](#) filed January 30, 2014.) The Clerk is further directed to close the case with prejudice.

So ordered this 2nd day of September, 2014.

_____
DAVID NUFFER
UNITED STATES DISTRICT JUDGE